IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

MARTHA JEAN GATHRIGHT                                              PLAINTIFF

V.                              NO. 09-6091

MICHAEL J. ASTRUE,
Commissioner of Social Security Administration              DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Martha Jean Gathright, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claim for supplemental security income (SSI) benefits under the provision of Title XVI of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

**I. Procedural Background:**

Plaintiff filed her application for SSI on September 19, 2005, alleging an inability to work since March 10, 2003, due to arthritis, heart disease and sleep apnea. (Tr. 93 ). The ALJ found that the Plaintiff engaged in substantial gainful activity from March 10, 2003 until September 16, 2005. (Tr. 14). An administrative hearing was held on March 22, 2007, at which Plaintiff, Plaintiff's counsel, and a Vocational Expert (VE) appeared and testified. (Tr. 1034-1057).

By written decision dated June 5, 2007, the ALJ found that during the relevant time period, Plaintiff had the following severe impairments: coronary artery disease status post stenting times two; possible diastolic dysfunction and atrial fibrillation; hypertension;

degenerative joint disease (osteoarthritis); obstructive sleep apnea; and obesity. (Tr. 15). However, after reviewing all of the evidence presented, he determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix 1, Subpart P, Regulation No. 4. (Tr. 17). The ALJ found Plaintiff retained the residual functional capacity (RFC) to perform:

> a wide range of light work activity. (The functional capacity to perform light work activity also includes the functional capacity to perform sedentary work activity). She can occasionally lift and/or carry up to 20 pounds and can frequently lift and/or carry up to 10 pounds. She is also capable of sitting, with normal breaks, for a total of about 6 hours in an 8-hour workday and is further capable of standing and/or walking, with normal breaks, for a total of about 6 hours in an 8-hour workday. Due to arthritis and obesity, she also has some postural limitations in the areas of being able to occasionally perform activities like climb, balance, stoop, kneel, crouch and crawl. She does not have any other additional significant postural limitations, manipulative limitations, environmental limitations, communicative limitations, or mental restrictions.

(Tr. 17). With the help of a vocational expert, the ALJ determined that Plaintiff could perform her past work as a taxi driver, as it was actually performed. (Tr. 19).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on September 9, 2009. (Tr. 4-6). Subsequently, Plaintiff filed this action. (Doc. 1). Both parties have filed appeal briefs, and this case is before the undersigned for disposition, by consent of the parties. (Docs. 6, 8-9).

**II. Evidence Presented:**

At the administrative hearing on March 27, 2007, Plaintiff testified that she obtained a ninth grade education. (Tr. 1037). She did not obtain a GED, but did receive a CNA certificate, which she allowed to expire. (Tr. 1037, 1039). Plaintiff spent several years driving a taxi, off and on, since 1977, and also did some housekeeping and laundry over the years.

The medical evidence during the relevant time period reflects the following.[1] On October 5, 2005, Plaintiff presented to the Emergency Room at St. Joseph's Mercy Health Center (St. Joseph's), complaining of shortness of breath and irregular heartbeat. (Tr. 353). She was diagnosed with intermittent atrial fibrillation by history and noncardiac chest pain. (Tr. 354). Dr. Stanley S. Josef, of Central Arkansas Cardiovascular Institute (CACI), reported that Plaintiff had a history of angina, status post PTCA (percutaneous transluminal coronary angioplasty), and stenting of the LAD (left anterior descending) in 2003, and the risk factors included hypertension and hyperlipidemia.[2] He stated that plaintiff also suffered from paroxysmal atrial fibrillation[3] and was on Coumadin and Rythmol therapy. Plaintiff was complaining of recurrent palpitations on Rythmol and some pleuritic-like sided chest discomfort. (Tr. 356). A chest x-ray was reported as negative, the D-dimer was negative, and an EKG showed a sinus mechanism with no ischemic changes. Dr. Josef also noted that plaintiff had a remote smoking history. (Tr. 356). An x-ray of the chest indicated shallow inspiration, but no active chest disease. (Tr. 360-361, 821).

A myocardial spect scan done on October 6, 2005, revealed a fixed count defect in the

---

[1] Prior to the relevant time period, Plaintiff sought treatment for and/or was diagnosed with: gallstone removal; chest and arm pain; shortness of breath; left shoulder strain; neck pain; hysterectomy; hypertension; heavy tobacco use; angina; dyspnea on exertion; shortness of breath; sleep apnea; heart racing; atrial fibrillation; hyperlipidemia; obesity; stent in 2003 and 2006; and arthritis pain. (Tr. 141-146, 152, 157, 179-180, 190-196, 204, 214, 226, 290, 293, 395-398, 404-405, 431, 433-434, 436-438, 447-448, 459-461, 471-474, 479, 481-482, 494-495, 515-517, 555-563, 777, 785, 790,796-797, 806, 809-811, 860-862, 868-869, 876-881).

[2] Hyperlipidemia - A general term for elevated concentrations of any or all of the lipids in the plasma, such as hypertriglyceridemia, hypercholesterolemia, and so on. See also table of hyperlipoproteinemias. Called also hyperlipemia, lipemia, and lipidemia. Dorland's. Illustrated Medical Dictionary 903 (31st ed. 2007).

[3] Atrial fibrillation - An arrhythmia in which minute areas of the atrial myocardium are in various uncoordinated states of depolarization and repolarization due to multiple reentry circuits within the atrial myocardium; instead of intermittently contracting, the atria quiver continuously in a chaotic pattern, causing a totally irregular, often rapid ventricular rate. Id. at 708.
Paroxysmal - Recurring in paroxysms. Id. at 1405
Paroxysm - A sudden recurrence or intensification of symptoms. Id.

distal anterior wall, likely related to attenuation artifact, and a small fixed defect in the left ventricular apex, which might indicate a previous nontransmural myocardial infarction. (Tr. 399). It also revealed no scintigraphic evidence of myocardial ischemia[4]; very mild kypokinesis in the left ventricular apex; and a normal left ventricular ejection fraction.[5] (Tr. 355, 358, 399).

On November 1, 2005, Plaintiff saw Dr. Jeffrey P. Stewart at Little Rock Cardiology Clinic, P.A., for a second opinion. (Tr. 737). Dr. Stewart found, after reviewing her records, that Plaintiff had an ejection fraction of 61%. (Tr. 572). He stated that as to Plaintiff's shortness of breath, he felt the only thing he could offer her for diagnosis was likely diastolic dysfunction.[6] He stated that he was going to perform a directed echo to evaluate mitral valve inflow. "Otherwise, I feel that her weight of 288 is a tremendous contribution to her shortness of breath." (Tr. 572). Dr. Stewart found Plaintiff had paroxysmal atrial fibrillation which was currently controlled with Rythmol, and that her palpitations were likely atrial dysrhythmia. (Tr. 572).

On November 14, 2005, Dr. Marvin N. Kirk conducted a "Social Security Physical" and found that plaintiff suffered from moderate osteoarthritis and degenerative joint disease, involving both knees, with bilateral joint effusions seen. (Tr. 163). At the time of the examination, Plaintiff was recorded as 5'3" tall and weighed 287 pounds. (Tr. 271). Plaintiff's heart had normal murmurs, and the range of motion in her spine was within normal range. (Tr.

---

[4]Myocardial ischemia - Deficiency of blood supply to the heart muscle, due to obstruction or constriction of the coronary arteries. Id. at 975.

[5]Ejection fraction - The proportion of the volume of blood in the ventricles at the end of diastole that is ejected during systole; it is the stroke volume divided by the end-diastolic volume, often expressed as a percentage. It is normally 65 ± 8 per cent; lower values indicate ventricular dysfunction. Id. at 751.

[6]Diastolic - Of or pertaining to diastole. Id. at 518.
Diastole - The dilation, or period of dilatation, of the heart, especially of the ventricles; it coincides with the interval between the second and the first heart sounds. Id.

272). She had swelling of both hands, and her knees flexed at 90-110 degrees. (Tr. 272). There was weakness of the thigh muscle, but no muscle atrophy. (Tr. 273). Her gait and coordination were slow and painful. (Tr. 273). Dr. Kirk found Plaintiff: was able to hold a pen and write; could touch her fingertips to her palm; had 60% grip; opposed her thumb to her fingers; picked up a coin; and could stand and walk without assistive devices. (Tr. 273). He further found that Plaintiff could not walk on heel and toes or squat and arise from a squatting position. (Tr. 273). Dr. Kirk's diagnosis was:

1. Degenerative arthritis of hand, knee, feet and ankles;
2. ASHD[7] with remote MI or diastolic dysfunction, class 3;
3. Sleep apnea;
4. Morbid obesity;
5. Hypertension; and
6. Intermittent atrial fibrillators.

He also found that walking and standing was severely limited due to Plaintiffs heart and arthritis. (Tr. 275).

On November 16, 2005, a Physical RFC Assessment was completed by Dr. Ron Crowe. (Tr. 259-266). Dr. Crowe found that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and push and/or pull in an unlimited fashion. (Tr. 260). He found that Plaintiff's postural limitations were that she could: frequently climb ramps/stairs, ladders/ropes/scaffolds; balance, kneel, and crawl; and occasionally stoop and crouch. (Tr. 261). He found she could do occasional stooping/crouching with her diagnoses of degenerative joint disease in her knees and with her morbid obesity. (Tr. 261). No manipulative, visual,

---

[7]The Court is unsure whether this acronym means arteriosclerotic heart disease or atrioseptal heart defect.

communicative, or environmental limitations were established. (Tr. 261-263). Dr. Crowe addressed Dr. Kirk's findings that Plaintiff was severely limited in her walking and standing as follows:

> MSS (GPCE, 11/05) describes "severe" limitations due to "heart and arthritis". Claimant has H/O PCI (2003) and stability (Re: CAD/angina) since. In fact, at GPCE, MD notes no CP, and cardiopulmonary exam is normal. [Claimant has had some intermittent problems with PAF/Atrial flutter, but currently controlled on anti-arrhythmic Rx]. There is nothing in the longitudinal MER, including the current GPCE and Cardiac ROS, that suggests [any] cardiac limitation. Similarly, there is nothing in the longitudinal MER that suggests significant problems with arthritis. Claimant does list an nsaid [non-steroidal anti-inflammatory drug] on medication list, and is noted to have symmetrical decrease in ROM of the knees, but no synovitis. Gait said to be "slow and painful", and x-ray of knees by GPCE MD said to show "moderate" OA. Claimant does have co-morbid condition of obesity, with BMI=51 based on GJPCE Ht./Wt. (63"/287 lb.).
>
> MER supports light RFC with postural limitations.

(Tr. 265).

On November 17, 2005, Plaintiff presented herself to Charitable Christian Medical Clinic (CCMC) where she was recorded as weighing 286 pounds, and was assessed with controlled hypertension; hyperlipidemia; "Afib - wearing better;" and CHF(congestive heart failure) - Diasotolic. (Tr. 289).

On February 1, 2006, Plaintiff presented to CCMC, needing refills on her medications, and was assessed with Atrial Fib; chronic anticoag/CHF(congestive heart failure)/resolving gastreoenteritis. (Tr. 287). On March 8, 2006, she again presented to CCMC, stating that her heart was still racing at times and that she had occasional shortness of breath. She was assessed with chronic afib, HX LAD(left anterior descending artery)/stent, and obesity. (Tr. 286).

On March 15, 2006, Plaintiff was assessed with degenerative joint disease of the interphalangeal joints of both thumbs as well as the distal interphalangeal joints of both index

AO72A
(Rev. 8/82)

fingers. (Tr. 337).

On April 14, 2006, Plaintiff presented to Little Rock Cardiology Clinic for follow-up, where she was seen by Dr. Wilson Wong. (Tr. 568-570). She stated that she had some sharp stabbing chest pain that lasted only seconds and resolved spontaneously, and that she also had COPD(chronic obstructive pulmonary disease) and a history of asthma, and was trying to stop smoking. (Tr. 568). "She is a smoker who quit in March 2006 but has had problems with consistently quitting." (Tr. 568). Dr. Wong assessed Plaintiff with atrial flutter status post Sotalol loading and TEE(transesophageal echocardiogram)/cardioversion; coronary artery disease status post recent stenting to the LAD(left anterior descending artery) with Dr. Stewart - stable; hypertension; morbid obesity; tobacco addiction with efforts to stop; chronic warfarin[8] therapy; small atrial septal defect with left to right heart shunt. (Tr. 569).

On May 10, 2006, Plaintiff was seen by Dr. Stewart for follow-up to her PTCA(percutaneous transluminal coronary angioplasty). (Tr. 566). She weighed 288 pounds and Dr. Stewart found that Plaintiff had chest discomfort that was of unclear etiology, and he was going to order an adenosine perfusion study. He also found she had atrial fibrillation flutter "now controlled on sotalol feeling much better." (Tr. 567). He added Prilosec for possible reflux. (Tr. 567).

On August 16, 2006, Plaintiff presented herself to CCMC complaining of chest pains and shortness of breath. She was assessed with chronic afib, history of CAD(coronary artery disease)/stent, "CRI," CHF (congestive heart failure), and costochondritis.[9] (Tr. 591).

---

[8] Warfarin - A synthetic coomarin anticoagulant that acts by inhibiting the hepatic synthesis of vitamin K-dependent coagulation factors (prothrombin and factors VII, IX , and X) and proteins C and S. Id. at 2103.

[9] Chondritis -Inflammation of cartilage. Id. at 357

A cardiac catheterization was performed on Plaintiff on September 11, 2006, at Arkansas Heart Hospital. The impression was widely patent left anterior descending stents, and Plaintiff's pain was not explained by the coronary angiogram and was therefore deemed noncardiac. (Tr. 684). An x-ray of her chest showed borderline heart size, but no infiltrates. (Tr. 633). Plaintiff advised that she "quit smoking yesterday" and that she had smoked 1 to 1 ½ packs per day. (Tr. 741). Plaintiff was assessed with angina; CAD (coronary artery disease); HTN (hypertension); CAF; tobacco abuse and related disorder; gerd (gastroesophageal reflux disease); obesity; and arthritis. (Tr. 730). An echocardiogram was done, and Dr. Stewart found the overall ejection fraction for the left ventricle was 70 percent or greater and that normal wall motion was seen throughout. (Tr.768). The impression was normal left ventricular systolic function with normal wall motion throughout and no significant valvular heart disease. (Tr. 768). The discharge diagnosis was:

1. Status post drug-eluting stent to the left anterior descending artery in March of 2006;
2. Status post selective coronary angiogram.
3. Hypertension;
5. Congestive heart failure;
6. Diastolic dysfunction;
7. Ejection fraction 55 to 60 percent;
8. Hyperlipidemia;
9. Tobacco abuse;
10. Obesity;
11. Gastroesophageal reflux disease;
12. History of atrial fibrillation.

(Tr. 671). The report also stated that Plaintiff's pain was not explained by the coronary angiogram. (Tr. 671).

On December 31, 2006, Plaintiff presented to the emergency room of St. Joseph's with irregular heartbeat. (Tr. 647). She was then diagnosed with A-fib(atrial fibrillation) and history

-8-

of irregular heart rate, resolved. (Tr. 648). X-rays of Plaintiff's chest revealed a "grossly normal chest." (Tr. 649).

On February 21, 2007, Plaintiff presented to the University of Arkansas Medical Center, complaining of chest pain and headaches. (Tr. 910). The provisional diagnosis was chest pain NOS. (Tr. 925). The secondary diagnoses was non-cardiac chest pain. (Tr. 925). The report also indicated that on February 23, 2007, smoking cessation, diet/exercise, and medication counseling were done. Portable x-rays taken on February 21, 2007, indicated a slight increase in the central pulmonary, and the secondary diagnosis was non-cardiac chest pain. (Tr. 995). The diagnosis also indicated that Plaintiff did not have CHF(congestive heart failure), community acquired pneumonia, or "stemi, nstemi, or unstable angina." (Tr. 995). On February 22, 2007, in the Stress Test worksheet, Plaintiff reported that she quit smoking "5 weeks ago." (Tr. 951).

On March 1, 2007, Plaintiff was reported as "doing quite well," had no complaints, her EKG was checked, and she was noted as being "in a sinus rhythm." (Tr. 663).

On March 15, 2007, Plaintiff saw Dr. Rajesh K. Shroff as a new patient. (Tr. 32). She was reported as being a "chronic smoker but has stopped about 2 months ago." (Tr. 32). At that time she weighed 300 pounds. (Tr. 33). Dr. Shroff's impression was:

> 1. ASHD (arteriosclerotic heart disease) with history of PTCA(percutaneous transluminal coronary angioplasty) and stent done twice in the past in 2003 by Dr. Sharma and in 2006 in Little Rock.
> 2. Paroxysmal atrial fibrillation.
> 3. Angina.
> 4. Hyperlipidemia.
> 5. Hypertension.
> 6. Obesity.

(Tr. 33). An echocardiogram cardiac doppler and color flow report indicated:

1. Left ventricle is of normal size.
2. There is adequate LV systolic function ejection fraction is 50%.
3. Mildly enlarged left atrium.
4. There is no pericardial efusion.
5. Normal right ventricular size.
6. Left ventricle hypertrophy.

(Tr. 37). Plaintiff also was reported as having a borderline ECG (electrocardiogram). (Tr. 38).

Regarding Plaintiff's daily activities, Plaintiff reported that she took her pills, showered, sat on the couch and watched the news and stayed off of her legs as much as possible. (Tr. 112). She stated that she cooked when she was able, could not stand on her legs for a long time, would take her heart pill and go to bed early. (Tr. 112). She stated that she dusted, swept and did the laundry a little at a time and that she could not drive any more because it hurt her legs and knees. She went to church on Sundays and could not lift, squat, bend, stand, reach, kneel or lift over 3-5 pounds. (Tr. 117). She said she could not walk or climb stairs, had a lot of trouble with memory, concentration, completing tasks, and understanding, and that it hurt her fingers trying to open a jar or bottle. (Tr. 117). With respect to her pain, she stated that her legs and knees and bones hurt a lot and she was very tired most of the time. Her pain was located in her knees, toes, and legs. (Tr. 120). She reported that she could not stand or walk at any amount of time without hurting or being out of breath. (Tr. 89).

At the hearing, Plaintiff testified that her major disabling condition was mostly her heart and arthritis. (Tr. 1039). She also stated that her heart raced two or three times a week, and that she was doing fine until about 3 months prior. (Tr. 1042). She also complained that her sternum bone hurt every once in a while. (Tr. 1043). She stated she had arthritis most of the time, and

that she took acetaminophen four to six times a day, which helped at times. (Tr. 1044). Plaintiff stated that she also had sleep apnea and had a CPAP machine, although she had not used it for about 8 or 9 months. (Tr. 1048). Plaintiff testified that she quit smoking in January of 2007. (Tr. 1049). On January 29, 2006, Plaintiff was taking Rythmol, Coumadin, Celebrex, Benicar, Toprol, Vytorin, Hydrochlorthiazide, and Wellbutrin. (Tr. 351). She testified at the hearing that she did not have any side effects from her medication, and at that time, she was not taking any medication for depression. (Tr. 1052).

**III. Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one

year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§423(d)(3), 1382(3)(D). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing her claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given her age, education, and experience. See 20 C.F.R. §416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity (RFC). See McCoy v. Schwieker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §416.920.

**IV. Discussion**

Plaintiff contends that the ALJ erred in concluding that the Plaintiff was not disabled. Defendant contends the record supports the ALJ's determination that Plaintiff was not disabled during the relevant time period of September 16, 2005, through June 5, 2007.

### A. Consideration of Impairments

Plaintiff contends that the ALJ failed to consider Plaintiff's impairments in combination, and especially with regard to her obesity. (Doc. #8 at p.7). However, Plaintiff has not identified any specific listing or provided any analysis regarding how, specifically, her impairments satisfy the requirements of any particular listing. See Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). The ALJ found that Plaintiff had the following medically-documented severe impairments: coronary artery disease status post stenting times two; possible diastolic dysfunction and atrial fibrillation; hypertension; degenerative joint disease (osteoarthritis); obstructive sleep apnea; and obesity. (Tr. 15). The ALJ specifically discussed Plaintiff's atrial fibrillation flutter, heart rate and rhythm, chest pain, musculoskeletal aches and pains, obesity, sleep apnea, smoking, and depression, and concluded:

> The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

(Tr. 15-17). The Court finds that there is substantial evidence that the ALJ considered Plaintiff's impairments alone and in combination. See Cook v. Barnhart, No. 03-3155, 2004 WL 1434862 at *1 (8th Cir. June 28, 2004), citing Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000)(ALJ is not required to discuss all evidence, and failure to cite specific evidence does not mean it was not considered); Hajek v. Shalala, 30 F.3d 89, 92 (8th Cir. 1994)(conclusory statement that ALJ did not consider combined effects of impairments was unfounded where ALJ noted each impairment and found that impairments, alone or combined, were not of listing-level severity).

### B. Subjective Complaints and Credibility Analysis:

The Court will next address the ALJ's assessment of Plaintiff's subjective complaints.

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions. See Polaski v Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

In the present case, the ALJ stated that Plaintiff's subjective allegations and complaints were thoroughly evaluated and completely considered utilizing the criteria set forth in the Polaski. (Tr. 18). He also found that:

> a reasonable conclusion can be reach [sic] that the frequency, intensity, and duration of the claimant's pain should not or would not preclude her from engaging in less strenuous light work activity. The undersigned does not deny the claimant may be experiencing some periodic pain and discomfort; however, not all pain and discomfort are disabling and the mere fact that working may cause pain or discomfort does not mandate a finding of disability.
> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to occasionally produce some of the alleged symptoms, but further finds that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible nor are they completely supported by the medical evidence of record.

(Tr. 18).

The ALJ elaborated by noting that Plaintiff's chest pain was not explained by the

coronary angiogram and was therefore noncardiac in origin. (Tr. 15). He noted that her atrial fibrillation flutter was considered controlled. (Tr. 15). The ALJ stated that during Plaintiff's February 21, 2007 emergency room treatment, she described her chest pain as being no more than a 2 or 3 on a scale of 0 to 10; usually lasting for about 3 to 4 minutes; and being relieved with nitroglycerin pills. (Tr. 15, 910-911)[10]. He found, and the evidence supports, that there was no medically-documented evidence that Plaintiff had exhibited any consistent or prolonged restricted range of motion in her cervical or lumbar spine or in any major joints of either of her upper extremities or lower extremities. The Court also notes that Dr. Kirk noted swelling in both of Plaintiff's hands, and 60% grip in her hands. (Tr. 272-273). However, Dr. Crowe had the benefit of Dr. Kirk's evaluation, as well as all of the medical evidence of record at that time, when he prepared his RFC, and concluded that no manipulative limitations were established. (Tr. 262). The ALJ also noted that Plaintiff had not used her prescribed CPAP machine in over 8 months, that Plaintiff had a history of smoking over 2 packages of cigarettes per day, and that the medical evidence of record did not reveal any medical treatment, medications, or complaints to a physician regarding her depression. (Tr. 17).

The ALJ also discussed Plaintiff's smoking habit. At the time of Plaintiff's application for SSI benefits, she was smoking up to three packs of cigarettes per day. (Tr. 408). Despite urging from physicians to quit smoking, she was still smoking on April 14, 2006, and on September 11, 2006, she reported that she quit smoking the previous day. (Tr. 741). However, on the date of her hearing - March 22, 2007 - Plaintiff testified that she had smoked 2 ½ to 3

---

[10]The Court notes that one of the February 21, 2007 records indicates the severity of Plaintiff's condition was rated "10" on a scale of 0-10. (Tr. 913). However, doctor's notes state that "Today's pain was about 2/10 in intensity, and now the pain is gone" and "Pt. Does note that nitro relieves the pain." (Tr. 918).

packs per day, and quit smoking in January of 2007. (Tr. 1049). Not only do Plaintiff's inconsistent statements lessen her credibility, but an ALJ may properly consider the claimant's noncompliance with a treating physician's directions, including failure to quit smoking. Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006) citing Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997). It is clear that Plaintiff had issues with cessation of her smoking until January 2007, when she allegedly quit permanently.

With regard to Plaintiff's obesity, the ALJ noted that Plaintiff's treating cardiac specialist physician encouraged her to lose weight. However, Plaintiff gained weight from 270 pounds in 2003 to 292 pounds in March of 2007. When she was seen by Dr. Stewart on November 1, 2005, Dr. Stewart recorded that he felt that her weight of 288 was a tremendous contribution to her shortness of breath. (Tr. 572). While obesity can impose significant work-related limitations, there is nothing in Plaintiff's medical records which indicated that a physician ever placed physical limitations on Plaintiff's ability to perform work-related functions because of her obesity other than the postural limitations the ALJ recognized in this case - that due to her arthritis and obesity, Plaintiff could only occasionally perform activities like climb, balance, stoop, kneel, crouch and crawl. See McNamara v. Astrue, 590 F.3d 607, 611 (8th Cir. 2010). Plaintiff's failure to testify at her hearing before the ALJ about any work-related limitations caused by her obesity further undermines her claim. Id. Finally, the ALJ included obesity in the first hypothetical he gave to the VE.

In addition, although Plaintiff suffered from sleep apnea, and reported to Dr. Jerry Barnes on August of 2004 that when using the CPAP machine, she felt much more alert during the day, she told Dr. Barnes on December 20, 2004, that she had not been wearing her CPAP every night.

(Tr. 142). He advised Plaintiff that she needed to wear her CPAP more routinely. Plaintiff testified that every time she used the CPAP, it made her heart flutter, so she was scared to use it. (Tr. 1048). However, the records do not indicate that she mentioned this to any physician, and failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits. Brown v. Barnhart, 390 F.3d 535, 540-541 (8th Cir. 2004).

An ALJ is not required to discuss each Polaski factor in a scripted fashion, so long as the ALJ acknowledged and considered those factors before discounting the claimant's subjective complaints. See Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004). The Court finds that the ALJ properly considered each Polaski factor and Plaintiff's allegations of pain.

### C. Residual Functional Capacity Assessment

The Court next turns to the ALJ's assessment of Plaintiff's RFC. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8thCir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a

claimant's limitations and to determine how those limitations affect his RFC." Id.

In the present case, the ALJ stated that he considered all symptoms, and the extent to which they could reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. 416.929 and SSRs 96-4p and 96-7p. He also considered opinion evidence in accordance with the requirements of 20 C.F.R. 416.927 and "SSRs 96-2p, 96-5p, 96-6p and 06-3p." The ALJ considered the medical records, testimony and test results and did not reject the opinion of any treating physician. See Fenton v. Apfel, 149 F.3d 907, 911-12 (8th Cir. 1998)(no treating physician restricted plaintiff from working). The evidence does not establish that Plaintiff had greater functional limitations that lasted a duration of twelve months, and impairments that can be controlled with treatment or medication are not disabling. See Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (holding that an impairment controllable with treatment or medication is not considered disabling). Based upon the record as a whole, the Court finds substantial evidence to support the ALJ's RFC determination.

### D. Hypothetical Question to the Vocational Expert

The Plaintiff argues that the ALJ failed to fully and fairly develop Plaintiff's vocational profile by presenting a hypothetical that encompassed all of Plaintiff's impairments, including her non-exertional limitations. (Doc. #8 at p. 16). The ALJ's first hypothetical was presented as follows:

> Please assume an individual 52 years of age with a ninth grade education and the same past relevant work as Ms. Gathright. Assume an ability to stand and walk six hours out of an eight-hour workday; sit six hours out of an eight-hour workday; lift and carry 20 pounds occasionally, 10 pounds frequently; and occasionally kneel and crouch due to degenerative arthritis of the knees and obesity. Based on these limitations could such an individual perform any of Ms. Gathright's past relevant work?

(Tr. 1055). In response, the VE stated that the Plaintiff would be able to perform the job of taxi driver, as it was performed. (Tr. 1055).[11] The VE also stated there were jobs such as a receptionist and travel clerk that Plaintiff could perform as well. (Tr. 1055-56). The Court finds that the hypothetical the ALJ posed to the VE fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. See Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997); Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996). Accordingly, the Court finds that the VE's testimony constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff is not disabled, as she is able to perform her past relevant work as a taxi-driver, as it was performed by her. See Pickney, 96 F.3d at 296 (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

**V. Conclusion**

Based upon the foregoing, the Court finds that there is substantial evidence to support the ALJ's finding that Plaintiff is not disabled.

DATED this 8th day of December, 2010.

/s/ Erin L. Setser
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

---

[11] In her capacity as a taxi driver, Plaintiff frequently lifted less than 10 pounds, and worked 12 hours a day, 4 days a week. (Tr. 122).